IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CAPITAL INVENTORY, INC.,              :
                                      :
                                      :
        Plaintiff,                    :
                                      :
v.                                    :        CIVIL ACTION NO.
                                      :        1:20-CV-03224-LMM
                                      :
CHRISTOPHER E. GREEN, RYAN            :
E. WILLIAMS, and MERIDIAN             :
INVENTORY SERVICES INC.,              :
                                      :
        Defendants.                   :

**ORDER**

This case comes before the Court on Plaintiff's Motion for Summary

Judgment [117] and Defendants' Motion for Summary Judgment [127]. After due

consideration, the Court enters the following Order.

## I.    BACKGROUND

This case arises from Defendants Christopher E. Green and Ryan E.

Williams's employment with Plaintiff Capital Inventory, Inc. ("Capital

Inventory") and subsequent business venture, Defendant Meridian Inventory

Services Inc. ("Meridian").

### A. Parties

Plaintiff provides pharmaceutical inventory services to hospitals, pharmacies, and universities. Dkt. Nos. [140-1] at 4–5; [1-2] at 2. Defendant Williams worked as Plaintiff's Director of Operations from February 2011 until he resigned in May 2020. Dkt. No. [125] at 11. Plaintiff hired Defendant Green as its Assistant Director of Operations in March 2014; in May 2020, he became Plaintiff's Director of Operations until his termination on July 14, 2020. Dkt. No. [140-1] at 6. Defendants Green and Williams ("the Individual Defendants") executed the employment agreements at issue with Plaintiff on September 2, 2016. Id.

On October 19, 2018, while employed by Plaintiff, Defendants Green and Williams incorporated Defendant Meridian Inventory Services, Inc. (Meridian) in the State of Georgia. Dkt. No. [138] ¶ 23. Defendants Green and Williams are managing partners of Defendant Meridian, which is an inventory services provider that offers services including conducting pharmaceutical inventories.[1] Dkt. No. [140-1] at 18–19. Defendant Williams is Meridian's Chief Operating Officer and Defendant Green is its Chief Executive Officer. Id.

---

[1] The parties dispute the exact timing of when Defendant Meridian began offering pharmaceutical inventory services as well as to what extent Defendant Meridian offered other services, including inventory optimization services. The Court addresses these issues below.

### B. Procedural History

Plaintiff previously filed a motion for a temporary restraining order, which the Court held a hearing on and ultimately granted. Dkt. No. [40]. In that order, the Court granted Plaintiff's proposed modifications to the employment agreements to narrow their application and comply with the Georgia Restrictive Covenants Act. Id. at 9 (citing O.C.G.A. § 13-8-53(d)). These modifications had the following effects: (1) limiting the duration of both the employee non-solicitation covenant and customer non-solicitation covenant to two years, (2) limiting the scope of the employee non-solicitation covenant to eliminate the restriction on hiring Plaintiff's other former employees "for any reason," (3) narrowing the customer non-solicitation covenant to allow passive acceptance of customers. Id. at 9, 13. The Court also considered and rejected Defendants' arguments that these covenants were unreasonable or unenforceable as modified.

The Court also previously dismissed Defendants' counterclaims for attorney's fees under the Defend Trade Secrets Act and Georgia Trade Secrets Act. Dkt. No. [113] at 17.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing the Court, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The moving party's burden is discharged merely by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." Celotex Corp., 477 U.S. at 325. In determining whether the moving party has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. Johnson v. Clifton, 74 F.3d 1087, 1090 (11th Cir. 1996).

Once the moving party has adequately supported its motion, the non-movant then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). There is no "genuine [dispute] for trial" when the record as a whole could not lead a rational trier of fact to find for the nonmoving party. Id. (citations omitted). All reasonable

4

doubts, however, are resolved in favor of the non-movant. <u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1115 (11th Cir. 1993).

The same standard of review applies to cross-motions for summary judgment, but the Court must determine whether any of the parties deserves judgment as a matter of law on the undisputed facts. <u>S. Pilot Ins. Co. v. CECS, Inc.</u>, 52 F. Supp. 3d 1240, 1242–43 (N.D. Ga. 2014) (citing <u>Am. Bankers Ins. Grp. v. United States</u>, 408 F.3d 1328, 1331 (11th Cir. 2005)). Each motion must be considered "on its own merits, [with] all reasonable inferences [resolved] against the party whose motion is under consideration." <u>Id.</u> at 1243.

## III.   DISCUSSION

Plaintiff moves for summary judgment on its claims for breach of contract, breach of fiduciary duty, tortious interference with its employees and business relationships, and violations of the Defend Trade Secrets Act ("DTSA") and Georgia Trade Secrets Act ("GTSA"). Dkt. No. [117-2] at 3.[2] Plaintiff also asks the Court to grant summary judgment against Defendant on its counterclaims of libel, slander, and tortious interference. <u>Id.</u>

---

[2] Plaintiff requests dismissal without prejudice of its Computer Fraud and Abuse Act claim, citing intervening precedent. Dkt. No. [117-2] at 3. In their response, Defendants consented to dismissal *with* prejudice of this claim, but did not articulate a reason why dismissal without prejudice would be improper. Dkt. No. [140] at 2. Defendants had previously moved for summary judgment against Plaintiff on this claim. Dkt. No. [127] at 26–28. The Court grants dismissal of Plaintiff's Computer Fraud and Abuse Act claim without prejudice, finding that Defendants' other counterclaims can remain pending for independent adjudication without this claim. Fed. R. Civ. P. 41(a)(2).

Defendants move for summary judgment on all of Plaintiff's claims, but not on their own claims. Dkt. No. [127-2] at 42.

### A. Plaintiff's Claims

Both Plaintiff and Defendants seek summary judgment on Plaintiff's breach of contract, breach of fiduciary duty, tortious interference with business relationships, GTSA, and DTSA claims.

### i.  Breach of Contract

Plaintiff's first claim is for breach of contract against Defendants Williams and Green. Plaintiff's breach of contract claim alleges that the Individual Defendants breached terms in their employment contracts preventing them from competing with Plaintiff, engaging in work for an employer other than Plaintiff, soliciting Plaintiff's customers and employees, and misappropriating Plaintiff's confidential information. Dkt. No. [117-2] at 5.

Defendants argue that they are entitled to summary judgment on Plaintiff's breach of contract claims, arguing the contracts contain unenforceable restraints on trade and were not breached. Dkt. No. [127-2] at 11.

The elements of a breach of contract claim in Georgia are (1) a valid contract; (2) material breach of its terms; and (3) resultant damages to the party having the right to complain that the contract has been broken. See TechBios, Inc. v. Champagne, 688 S.E.2d 378, 381 (Ga. Ct. App. 2009). The enforceability of a restrictive covenant is a legal question for the court, rather than jury, to decide. Lapolla Indus., Inc. v. Hess, 750 S.E.2d 467, 473 (Ga. Ct. App. 2013).

## 1. Non-Competition

Plaintiff argues that Defendants Green and Williams breached the provisions in their employment agreements that prevented them from competing with Plaintiff or engaging in other business activity while employed by Plaintiff. Dkt. No. [117-2] at 5–6. Specifically, Plaintiff argues that Defendants Green and Williams's conduct violated paragraphs 2.2 and 5.2 of the employment agreements. Id. at 6. Those paragraphs, as modified by the Court's prior order,[3] Dkt. No. [40], state:

### [¶ 2.2]

While the Employee is employed by the Company, the Employee shall not, without the prior written consent of the Company, which may be withheld for any reason whatsoever (even if unreasonable) in the Company's sole, absolute and subjective discretion, at any time or place, directly or indirectly, to any extent whatsoever engage or agree to engage in any publishing business or become engaged in any other business activity to or for the benefit of any person or entity other than the Company.

### [¶ 5.2]

While the Employee is employed by the Company and for a period of ~~three (3)~~ **two (2)** years after the cessation of the Employee's employment with the Company for any reason whatsoever, the Employee shall not, to or for the benefit or account of the Employee or to or for the benefit or account of any other person or entity, directly or indirectly, without the prior written consent of the Company . . . Solicit ~~or accept~~ employment by or be retained by any person or entity who, at any time during the Employee's employment with the Company was a competitor of the Company or was a society, association, corporation, or other entity that contracted Business with the Company or other similar inventory related services and products of any nature whatsoever and in any medium for or on behalf of or in

_____

[3] The Court declines to reconsider its prior order.

7

connection with such society, association, corporation or other entity (a "Company Contracting Party").

Dkt. Nos. [1-1] at 3 ¶ 2.2; 5, ¶¶ 5, 5.2 (employment agreement of Christopher Green); [1-2] at 3 ¶ 2.2; 5, ¶¶ 5, 5.2 (employment agreement of Ryan Williams); [40] at 9 (modifying duration of ¶ 5.2 from three to two years and striking "or accept" language).

Defendants move for summary judgment on Plaintiff's breach of contract claims based on the non-competition provisions of the employment agreements. Dkt. No. [127-2] at 10. The Court will first address the enforceability of ¶¶ 2.2 and 5.2 and then move on to breach.

### a. Enforceability of ¶ 2.2

Defendants argue that ¶ 2.2 is legally unenforceable because it is overbroad and restricts Defendants Green and Williams from engaging in any other work, not just work that is competitive or damaging to Plaintiff. Dkt. Nos. [127-2] at 11; [140-2] at 3. Defendants also argued that the provision is unenforceable because it does not have a geographic scope limitation. Dkt. No. [140-2] at 3. Defendant asserts that the enforceability of these provisions is governed by O.C.G.A. § 13-8-53(a), which states, in relevant part, that, "enforcement of contracts that restrict competition during the term of a restrictive covenant, so long as restrictions are reasonable in time, geographic area, and scope of prohibited activities, shall be permitted." Id. Defendant also argues that the Court cannot blue pencil these provisions to add the missing geographic and activity limitations. Id. at 4.

Furthermore, Defendant argues that these non-compete provisions cannot be severed from the employment agreements and that, consequently, all the restrictive covenants in the agreements fail. Dkt. Nos. [127-2] at 12; [140] at 4.

Plaintiff argues that because this claim is based on Defendants Green and Williams's competition with Plaintiff while they were still employed by Plaintiff, rather than after their employment ended, that Defendants' arguments apply the wrong portion of the statute. Dkt. No. [147] at 1. Plaintiff argues that O.C.G.A. § 13-8-56(4), rather than O.C.G.A. § 13-8-53(a), governs the enforceability of ¶ 2.2. Id. at 1–2. The relevant portion of that statute provides, as a presumption, that:

> Any restriction that operates *during the term of an employment relationship* . . . shall not be considered unreasonable because it lacks any specific limitation upon scope of activity, duration, or geographic area so long as it promotes or protects the purpose or subject matter of the agreement or relationship or deters any potential conflict of interest.

O.C.G.A. § 13-8-56(4) (emphasis added).

With regards to the activity scope, Plaintiff argues that the prohibition on participating in "any other business activity" without Plaintiff's prior written consent was consistent with the purpose of the employment agreement and had the effect of deterring conflicts of interest. Dkt. No. [147] at 2. Additionally, Plaintiff argues that it had a legitimate business interest in restricting its employees' outside work. Finally, Plaintiff argues that the Court could modify ¶ 2.2 to restrict only "any other *competitive* business activity." Id. at 2 n.1; Dkt. No. [137] at 5–6.

The Court agrees with Plaintiff that O.C.G.A. § 13-8-56(4) governs the enforceability of this provision. Because ¶ 2.2 applies "[w]hile the Employee is employed by the Company," it is a "restriction that operates during the term of an employment relationship" and is therefore governed by O.C.G.A. § 13-8-56(4). Under § 13-8-56(4), failure to specify the scope of restricted activities will not independently make the covenant unenforceable. Similarly, the provision does not fail simply for lack of geographic scope.

However, Plaintiff still must show that the provision "promotes or protects the purpose or subject matter of the agreement or relationship or deters any potential conflict of interest." O.C.G.A. § 13-8-56(4). The Court finds that Plaintiff has failed to do so. As Defendant argues, this provision gives Plaintiff unfettered power to prevent the employees from engaging in any other business activity, regardless of whether it would have a negative impact to Plaintiff or in any way harm its interests. Plaintiff's argument just repeats the statute's language by saying that the term protects the agreements' purpose and deters conflicts of interest in a conclusory manner. Dkt. No. [147] at 2. Plaintiff's additional statement that it has an interest "in preventing current employees from competing" does not justify the breadth of ¶ 2.2, which applies to non-competitive work.

The decision to blue-pencil a covenant is committed to the discretion of a trial court. Belt Power, LLC v. Reed, 840 S.E.2d 765, 770 (Ga. Ct. App. 2020) (citing O.C.G.A. § 13-8-53(d) and stating that the court "may modify" a

covenant)). The Court declines to blue-pencil the provision to only restrict the employees' ability to "become engaged in any other *competitive* business activity" because ¶ 5.2 serves that function by prohibiting the employees from working for Plaintiff's competitors.

Because the Court finds that ¶ 2.2 is unenforceable, Defendants' motion for summary judgment on Plaintiff's claim for breach of ¶ 2.2 is **GRANTED**.

### b.  Enforceability of ¶ 5.2

The next issue concerns the enforceability of ¶ 5.2. Defendants argue that the agreements' non-competition provisions are inseparable and that ¶ 5.2 is unenforceable because ¶ 2.2 is unenforceable. Dkt. Nos. [127-2] at 12; [140] at 4; [150] at 5–6. Independently, Defendants argue that the covenant in ¶ 5.2 is illegal because it has a three-year duration, no geographic limitations, and no activity limitations. Dkt. No. [140] at 3–4. Defendants acknowledge that the Court can blue pencil the temporal scope but argue that the Court cannot modify the covenants to add geographic or activity limitations and that doing so would deprive Defendants of fair notice. Dkt. Nos. [150] at 5; [140] at 4.

Plaintiff argues that Defendants' arguments rely on inapplicable law on enforceability and outdated law on severability. Dkt. No. [137] at 6–7. In response to Defendants' argument that ¶ 5.2 is unenforceable because it cannot be severed from ¶ 2.2, Plaintiff argues that an unenforceable restrictive covenant in an agreement no longer renders other restrictive covenants in the same agreement unenforceable under current law. Id. at 6. Plaintiff has also argued

generally that O.C.G.A. § 13-8-56(4) applies, as discussed above in relation to ¶ 2.2. Plaintiff clarifies in its reply that it "seeks summary judgment on its claim that the Individual Defendants competed against it *while employed* by" Plaintiff. Dkt. No. [147] at 1 (italics in original).

As a preliminary matter, the Court does not agree with Defendants' severability arguments. Each of the cases Defendants cite to argue that the provisions are inseverable applied the prior law of restrictive covenants before the Georgia Restrictive Covenant Act and its amendments to O.C.G.A § 13-8-50 *et seq*. took effect. See Dkt. No. [127-2] at 12. Defendants' only case on this point that was decided after 2011 still applied pre-2011 law because the underlying contract was entered before the amended statute took effect. See CMGRP, Inc. v. Gallant, 806 S.E.2d 16, 19 n.2 (Ga. Ct. App. 2017). Even Defendants' citation to a treatise on restrictive covenants states the rule against severability under its portion on Georgia's "former law." Dkt. No. [140] at 7 (citing John Larkins, Jr., Georgia Contracts: Law and Litigation § 8-6 (2d ed. 2021)). Given the lack of applicable precedent and substantial legislative changes, the Court will not strike ¶ 5.2 on severability grounds. See Gallagher Benefit Servs. v. Campbell, 528 F. Supp. 3d 1326, 1340 (recognizing that the GRCA "abrogated the common law cases" that preceded its passage); Cellairis Franchise, Inc. v. Duarte, No. 2:15-cv-00101-WCO, 2016 UWL 858787 at *3 (N.D. Ga. Mar. 2, 2016) ("Old cases involving common law interpretations of restrictive covenants are inapplicable here.").

The non-competition covenant of ¶ 5.2 applies "[w]hile the Employee is employed by the Company and for a period of two (2) years after the cessation of the Employee's employment with the Company for any reason whatsoever. . . ." Dkt. Nos. [1-1] at 5; [1-2] at 5. Because ¶ 5.2 contains restrictions that apply both during and after the Individual Defendants' employment with Plaintiff, the Court finds that the enforceability of ¶ 5.2 is governed by O.C.G.A. § 13-8-56(4) and O.C.G.A. § 13-8-53(a). O.C.G.A. § 13-8-56(4) applies to "[a]ny restriction that operates during the term of an employment relationship," while O.C.G.A. § 13-8-53(a) applies to "contracts that restrict competition during the term of a restrictive covenant."

Under O.C.G.A. § 13-8-56(4), ¶ 5.2 does not need a geographic or activity scope limitation to be enforceable "so long as it promotes or protects the purpose or subject matter of the agreement or relationship or deters any potential conflict of interest." The Court finds that, under that portion of the statute, ¶ 5.2 is sufficiently tailored to protect Plaintiff's interests in maintaining its customer goodwill associated with its ongoing business, which could be jeopardized by Plaintiff's employee's solicitation of competitive employment. O.C.G.A. § 13-8-51(9). Unlike ¶ 2.2, ¶ 5.2 is tailored to only restrict work for an entity that actually competed with Plaintiff while the employee worked for Plaintiff. Working for its competitor creates a much higher risk to Plaintiff's confidential information, customer good will, and other legitimate business interests protected by statute. Accordingly, O.C.G.A. § 13-8-56(4) does not invalidate this covenant.

13

Under O.C.G.A. § 13-8-53, the covenant's restrictions on competition "shall be permitted" "so long as such restrictions are reasonable in time, geographic area, and scope of prohibited activities." While ¶ 5.2 includes terms limiting its duration to two years, it does not have any geographic or activity scope restrictions. Accordingly, under O.C.G.A. § 13-8-53, ¶ 5.2 is presumptively unreasonable and unenforceable as written. Burbach v. Motorsports of Conyers LLC, 2022 WL 712381 (Ga. Ct. App. Mar. 10, 2022).

The Court can, however, blue pencil the provision "so long as the modification does not render the covenant more restrictive with regard to the employee than as originally drafted by the parties." O.C.G.A. § 13-8-53(d). Given that Plaintiff has articulated that it "seeks summary judgment on its claim that the Individual Defendants competed against it *while employed* by" Plaintiff, the Court will blue-pencil ¶ 5.2 to limit its application to only apply while the Individual Defendants were employed by Plaintiff. Dkt. No. [147] at 1 (italics in original). The Court exercises its discretion to modify ¶ 5.2 to read as follows:

[¶ 5.2]

While the Employee is employed by the Company ~~and for a period of three (3)~~ **two (2)** ~~years after the cessation of the Employee's employment with the Company for any reason whatsoever~~, the Employee shall not, to or for the benefit or account of the Employee or to or for the benefit or account of any other person or entity, directly or indirectly, without the prior written consent of the Company . . . Solicit ~~or accept~~ employment by or be retained by any person or entity who, at any time during the Employee's employment with the Company was a competitor of the Company or was a society, association, corporation, or other entity that contracted Business with the Company or other similar inventory related services and products

14

of any nature whatsoever and in any medium for or on behalf of or in connection with such society, association, corporation or other entity (a "Company Contracting Party").

Dkt. Nos. [1-1] at 5; [1-2] at 5.

The modified ¶ 5.2 does not apply to the employee's post-employment activities and accordingly is governed by O.C.G.A. § 13-8-56(4). For the reasons explained above, the modified provision is enforceable under Georgia law despite its lack of geographic or activity scope terms because it "promotes or protects the purpose of subject matter of the agreement . . . ." O.C.G.A. § 13-8-56(4).

### c. Breach

Now that the enforceability of ¶ 5.2 has been established, the Court considers the parties' respective arguments on breach.

Plaintiff argues that, as a matter of law, Defendants Green and Williams engaged in business activity on behalf of Meridian that constituted employment with a competitor in violation of ¶ 5.2. Dkt. No. [117-2] at 7. Plaintiff refers to seven acts it considers to be business activity on behalf of Meridian, which it argues violated the non-compete provision: (1) Defendants Green and Williams incorporated Meridian in October 2018; (2) Defendants Green and Williams were both managing partners of Meridian, with Defendant Green assuming the role of Meridian's Chief Executive Officer and Defendant Williams becoming Meridian's Chief Operating officer; (3) Defendant Green purchased laptops for conducting Meridian's work and actually did that work while employed by Plaintiff; (4) Defendants Green and Williams held meetings on Plaintiff's property during the

workday with some of Plaintiff's other employees to discuss Meridian's business; (5) Defendants Green and Williams solicited Plaintiff's employees to work for Meridian; (6) Defendants Green and Williams solicited Plaintiff's customers on Meridian's behalf; and (7) Defendants Green and Williams performed an inventory on Meridian's behalf at Cooper Green Mercy Health. Id. at 6–7. Plaintiff argues that all these acts done on behalf of Meridian breached both provisions because they constituted engaging in outside business activity without Plaintiff's permission under ¶ 2.2 and being retained by a competitor under ¶ 5.2. Id. at 7. Plaintiff argues that Meridian is its competitor because both companies offer inventory services and conduct physical inventories for pharmacy customers and Meridian did so while the Defendants Green and Williams were still employed by Plaintiff. Id. at 7–8.

Defendants argue that their conduct did not constitute a breach of those provisions. First, Defendants argue that ¶ 5.2 only prohibited Green and Williams's work for an "entity who, at any time during the Employee's employment with the Company, was a competitor" and that Meridian did not actually compete with Plaintiff until June 2020—after Williams no longer worked there. Dkt. No. [140] at 5. Second, they argue that "planning" activities—like incorporating Meridian, buying equipment, and having preliminary meetings— are not forms of competition. Id. Third, Defendants argue that the allegations of acts (5) and (6), which relate to solicitation of employees and customers, include disputed issues of material fact.

The Court begins by addressing the question of whether Meridian was Plaintiff's "competitor" at any time while the Individual Defendants were employed by Plaintiff. There is no genuine dispute that Meridian conducted its first physical inventory during the week of April 6, 2020 for Cooper Green Mercy Health while both Defendants Green and Williams were employed by Plaintiff.[4] Dkt. No. [140-1] at 66. Defendants argue, though, that these inventory services were not "competing" because Plaintiff had never serviced Cooper Green Mercy Health. Dkt. No. [140] at 5–6; see also Dkt. No. [66-1] at 5. Defendants also note that Plaintiff's employees who participated in the Cooper Green Mercy Health inventory had been sent home without work during the Covid-19 shutdown. Dkt. No. [140] at 6.

The Court is not persuaded by Defendants' arguments. Plaintiff is a provider of physical inventory services. It is uncontroverted that Meridian actually conducted physical inventory services for at least one customer—Cooper

---

[4] To show that Meridian did not compete with Plaintiff, Defendants cite Defendant Williams's affidavit, in which he testified that prior to his May 2020 resignation, Meridian "was not a competing inventory business because it did not conduct pharmaceutical inventory count services." Dkt. No. [66-1] at 5. This does not create a genuine factual issue as to whether Meridian conducted an inventory at Cooper Green Mercy Health. In his deposition, Defendant Williams stated that Meridian provided inventory services to Cooper Green Mercy Health that were "like a traditional inventory, a physical inventory." Dkt. No. [125] at 95. Additionally, in Defendants' response to Plaintiff's statement of undisputed material facts, Defendants agreed with the statement that "Defendant Meridian completed its first physical inventory during the week of April 6, 2020" and that the "inventory was conducted for Cooper Green Mercy Health." Dkt. No. [140-1] at 66.

Green Mercy Health—while both Defendants Green and Williams were employed by Plaintiff. Accordingly, under the employment agreements, Meridian was a competitor of Plaintiff under ¶ 5.2. Additionally, Defendants' arguments that "planning" activities alone do not constitute competition is immaterial given Meridian had begun providing physical inventory services during the Individual Defendants' employment with Plaintiff. As Plaintiff argues, Meridian was Plaintiff's competitor because it offered competing services—physical inventory services—and should still be considered a competitor during that time even if Cooper Green Mercy Health had never done business with Plaintiff. In fact, ¶ 5.2 prohibited the employees from working for "other similar inventory related services and products of any nature whatsoever," regardless of whether they were existing customers of Plaintiff. Dkt. Nos. [1-1] at 5; [1-2] at 5. Additionally, Defendants' argument that Plaintiff's employees were sent home due to Covid-19 at the time that the inventory was conducted is not persuasive because Defendants Green and Williams were still Plaintiff's employees and bound by their contracts at that time.

Having established that Meridian was a competitor of Plaintiff under the meaning of ¶ 5.2, the Court must determine whether either Defendant Green or Williams breached that provision. It is not disputed that both Defendant Williams and Green worked for Meridian while employed by Plaintiff. Dkt. Nos. [66-2] at 2 (Green affidavit); [66-1] at 2 (Williams affidavit). Accordingly, Plaintiff has demonstrated as a matter of law that both Defendants Green and

Williams breached ¶ 5.2 of their employment agreements, and this portion of their claim for summary judgment is **GRANTED**.

### 2. Non-Solicitation

Next, Plaintiff and Defendants Green and Williams argue that they are entitled to summary judgment on Plaintiff's breach of contract claims based on the agreements' non-solicitation provisions. Dkt. No. [127-2] at 28. These claims relate to ¶¶ 5.1 and 5.3, which, as modified by the Court's prior order, state the following:

> While the Employee is employed by the Company and for a period of ~~three (3)~~ **two (2) years** after the cessation of the Employee's employment with the Company for any reason whatsoever, the Employee shall not, to or for the benefit or account of the Employee or to or for the benefit or account of any other person or entity, directly or indirectly, without the prior written consent of the Company . . .
>
> [¶ 5.1]
> Solicit or induce any employee of the Company to leave the employ of the Company ~~or hire for any reason or purpose whatsoever any employee of the company or any employee who left the employ of the Company within 12 months of the date of the cessation of the Employee's employment with the Company~~.
>
> ...
>
> [¶ 5.3]
> Solicit ~~or accept~~ the business of any person or entity who, at any time during the Employee's employment by the Company, was a Company Contracting Party.

Dkt. Nos. [1-1] at 5; [1-2] at 5; [40] at 13, 17 (modifying ¶¶ 5.1, 5.3).

### a. Enforceability

Defendants argue that the non-solicitation provisions in ¶¶ 5.1 and 5.3 are unenforceable. First, Defendants argue that Georgia law does not allow non-solicitation provisions that prevent individuals from passively accepting unsolicited customers. Dkt. No. [140] at 6–7. The Court has already modified the customer non-solicitation covenant in ¶ 5.3 to only prevent the employees from soliciting these customers, rather than simply accepting them. Dkt. No. [40] at 17. Next, Defendants argue that the Court cannot blue-pencil these provisions and that they are inseparable from the other non-competition provisions in the agreement. Dkt. No. [140] at 7. The Court has already considered and rejected Defendants' arguments regarding blue-penciling, which is plainly permitted by O.C.G.A. § 13-8-53(d). Dkt. No. [40] at 16–18. Regarding severability, as discussed above, the Court does not find these provisions to be inseverable and is not persuaded by Defendants' citation of pre-GRCA case law. Finally, Defendants argue that, in the alternative, the Court should blue pencil the duration of these provisions. Dkt. No. [140] at 7. The Court has already modified both provisions to limit them to a term of two years, which is presumptively reasonable. O.C.G.A. § 13-8-57(b).

Accordingly, ¶¶ 5.1 and 5.3 are enforceable as modified by the Court's prior order. See Dkt. No. [40].

### b. Breach

Having established the enforceability of ¶¶ 5.1 and 5.3, the Court will first address whether the Individual Defendants breached the employee non-solicitation covenant in ¶ 5.1 and then whether they breached the customer non-solicitation covenant in ¶ 5.3.

### i. Employee Solicitation (¶ 5.1)

Plaintiff argues that Defendants Green and Williams solicited Plaintiff's employees to work for Meridian. Dkt. No. [117-2] at 12–13. Plaintiff first argues that Green and Williams solicited April Bearsley by explaining Meridian's concept and potential job opportunities for her. Then, Plaintiff argues that Defendants Green and Williams used Ms. Bearsley as an intermediary to solicit Plaintiff's employees, Jimmy Johnson and Jennifer Blanchard, to work for Meridian. Additionally, Plaintiff states that Defendants hired Kathryn Weikum, Andrew Wiggins, Joe Clark, and Samir Rolley to work for Meridian while they were still employed by Plaintiff. Finally, Plaintiff argues that Defendant Williams sought to induce another of Plaintiff's employees, Kelvin Lawver, to leave Plaintiff's employment and work for another one of Plaintiff's competitors.

Plaintiff argues that at least two of Plaintiff's employees—Jennifer Blanchard and either one or both of Joe Clark and Andrew Wiggins—came with Williams to conduct the inventory at Cooper Green Mercy Health while they worked for Plaintiff. Dkt. No. [125] at 95. Plaintiff also points to emails between Green, Williams, and Ms. Bearsley discussing what job titles she and Mr.

Johnson should take at Meridian. Dkt. No. [123-1] at 29–30. Defendant Green also sent an email on April 23, 2020, addressed to Ms. Bearsley, Jennifer Blanchard and others on behalf of Meridian with the email-subject "Employee information" and including tax paperwork for the recipients to fill out. Dkt. No. [123-1] at 31–41. Plaintiff argues that the employees that worked for both Plaintiff and Meridian caused Plaintiff to incur damages and that damages should be decided by a jury. Dkt. No. [147] at 8–9.

Defendants admit that they hired Plaintiff's former employees but argue that there is no undisputed evidence that they solicited or induced those employees to leave Plaintiff's employ. Dkt. No. [127-2] at 33. Instead, they argue that the employees were either involuntarily terminated by Plaintiff prior to starting at Meridian or that the employees independently approached Defendants about working at Meridian without being solicited to leave Plaintiff. Id. at 34.

As a preliminary matter, the terms of ¶ 5.1 do not prevent the Individual Defendants from *hiring* Plaintiff's employees but, instead, prohibit Green and Williams from soliciting or inducing Plaintiff's employees to "leave the employ of the Company."[5] Plaintiff's evidence that the Individual Defendants communicated about job titles, sent new-hire packets, and brought Plaintiff's

---

[5] Plaintiff proposed, and the Court granted, a modification to ¶ 5.1 to excise language in this provision that would have prevented Green and Williams from "hir[ing] for any reason or purpose whatsoever any employee of the Company or any employee who left the employ of the Company within 12 months of the date of the cessation of the Employee's employment with the Company." Dkt. No [40] at 13.

employees to work on the Cooper Green Mercy Healthy inventory do not directly show solicitation to leave Plaintiff's employment. While a jury could decide that evidence of Defendants' hiring these employees and their resignation from Plaintiff suggests that they had been induced to leave Plaintiff's employ, it would be impermissible for the Court to draw that inference at this stage. This is particularly true given that several of Plaintiff's employees had concurrent employment with Meridian and worked for both companies, including Ms. Bearsley and Mr. Johnson who never left Plaintiff.[6] Plaintiff must present evidence of the Individual Defendants' solicitation or inducement to leave Plaintiff's employ to prevail.

The evidence on this issue is conflicting. Ms. Bearsley testified that Defendants Green and Williams asked her if she wanted to become involved with Meridian in October 2018, later meeting with her and Jimmy Johnson at Plaintiff's workplace to discuss Meridian. Dkt. No. [53-2] at 3. Both Ms. Bearsley and Mr. Johnson testified that Defendants Green and Williams told them to plan to resign from Plaintiff in June 2020. Id.; Dkt. No. [53-3] at 4. With regards to Ms. Bearsley, the parties agree that she approached Defendants about her work frustrations but Defendants state that she independently expressed interest in joining potential efforts at Meridian once they were disclosed to her. Dkt. No.

---

[6] Defendants argue that Plaintiff allowed its employees to perform other inventories while employed by Plaintiff and that Plaintiff assured Defendant Green that the provision in his contract would not prevent him from doing so. See Dkt. Nos. [150] at 8 n.25; [140] at 6 n.6.

[140-1] at 27. Defendant Green also testified that he, at times, persuaded Ms. Bearsley to continue working for Plaintiff and to "hang in there." Dkt. No. [123] at 224. Ms. Bearsley testified that Defendants Green and Williams asked her to recruit her sister, Jennifer Blanchard, to join Meridian. Dkt. No. [53-2] at 3. Defendants dispute this point, citing Mr. Williams's testimony that Ms. Bearsley first mentioned the possibility of her approaching her sister. Dkt. No. [140-1] at 29.

Defendants state that two of Plaintiff's former employees who came to work for Meridian were terminated by Plaintiff months before coming to work at Meridian—Betsy Singleton and Mike Pamfilis. Dkt. No. [140-1] at 60. Regarding the other employees, Defendants point to the affidavits of employees Joe Clark, Andrew Wiggins, and Kathryn Weikum—in which they state that they resigned from Plaintiff "[w]ithout prompting from anyone." Dkt. Nos. [127-9] ¶ 2; [127-10] ¶ 2; [127-12] ¶ 2. In Defendant Meridian's 30(b)(6) deposition, Williams testified that Mr. Clark, Mr. Wiggins, and Ms. Weikum spoke to him about the Meridian plans and expressed their own interest independently. Dkt. No. [120] at 50, 64, 70. Williams also testified that, "As soon as these people knew I was leaving . . . . I had everybody calling me." Id. at 64. He also testified that "[t]he conversations that I would have had would have been after they contacted me and asked me about Meridian and what the plan was based on a conversation they had with Andrew [Wiggins.]" Id. at 70. Williams reiterated that these employees approached him after learning of Meridian through Mr. Wiggins or Ms. Bearsley,

claiming that the employees were friends and spoke with one another independently. Id. at 70–71.

Defendant Green testified that he and Defendant Williams had been told by Ms. Bearsley that Plaintiff's employees Jennifer Blanchard and Joe Clark "had to come with" the group leaving to Meridian. Dkt. No. [123] at 223–226. Green also testified that he had heard that Samir Rolley was considering resigning from Plaintiff to work for Meridian and that Green did not communicate with Mr. Johnson about Meridian until he heard that he was interested in joining. Id. at 221, 225.

The contradictory sworn testimony of Plaintiff's current and former employees and Defendants Green and Williams creates an issue of genuine material fact for a jury to decide. If the employees did approach Defendants Green and Williams, then there is no breach of the non-solicitation provision. See Wachovia Ins. Servs., Inc. v. Fallon, 682 S.E.2d 657, 662 (Ga. Ct. App. 2009). A reasonable jury could conclude that these employees approached Defendants Green and Williams and were not solicited or induced to leave Plaintiff's employ, but instead independently decided to leave the company for another opportunity. Additionally, because several employees worked concurrently for Meridian and Plaintiff without ever leaving Plaintiff's employ, it is not clear that Defendants' efforts to hire these employees constituted solicitation or induction to leave Plaintiff.

While many of the employee solicitation facts are disputed, the parties largely agree about Defendant Williams's actions towards one of Plaintiff's employees, Kelvin Lawver. Dkt. No. [140-1] at 59–60. Unlike the other employees, Plaintiff's claims regarding Kelvin Lawver are not that Defendants solicited him to come work for Meridian. Instead, the parties agree that Defendant Williams encouraged one of Meridian's competitors to contact Mr. Lawver about hiring him and that Williams contacted Mr. Lawver about updating his resume so that Mr. Lawver could be hired by the competitor. Dkt. No. [140-1] at 59–60. Plaintiff submits text messages between Defendant Williams and Mr. Lawver, in which Defendant Williams asked Mr. Lawver to send his resume, work on his resume, and describing an upcoming "opportunity" for Mr. Lawver and saying "Capital has let us and everybody down. We've been betrayed . . . ." Dkt. No. [1-8] at 5, 12, 14. Mr. Lawver declined the opportunity with the competitor and remains an employee of Plaintiff.[7] Dkt. No. [117-11] at 3. Defendants do not contest these facts. Instead, they argue that Plaintiff cannot show any damages result any breach because Mr. Lawver remained employed with Plaintiff.

The Court agrees with Plaintiff regarding Defendant Williams's solicitation of Mr. Lawver to leave Plaintiff. The evidence from Mr. Lawver's affidavit and his

---

[7] Defendants ask the Court to infer that Mr. Lawver had a desire to leave Capital once Defendant Williams left because Mr. Lawver referred to Defendant Williams as "the best boss." Dkt. No. [150] at 7. Given that Defendant Williams did stop working for Plaintiff to move to Meridian and Mr. Lawver remained employed by Plaintiff, even after being presented with other opportunities, the Court finds that is not a reasonable inference to be drawn in Defendants' favor.

text messages exchanged with Mr. Williams plainly show that Mr. Williams solicited Mr. Lawver to leave Plaintiff's employ.[8] The fact that Mr. Lawver remained with Plaintiff does not save Mr. Williams from breach because he only needed to "solicit" him to breach ¶ 5.1. Solicitation requires some affirmative act but is otherwise defined in the broadest possible sense while comporting to the parties' intentions. Akron Pest Control v. Radar Exterminating Co., Inc., 455 S.E.2d 601, 602–03 (Ga. Ct. App. 1995). Additionally, the Court rejects Defendants' argument that there can be no damages if Mr. Lawver never left the company. Damages could result from the solicitation alone if Plaintiff could show harm from Defendant Williams's solicitation of its employee, however minimal. O.C.G.A. § 13-6-6 ("In every case of breach of contract the injured party has a right to damages, but if there has been no actual damage, the injured party may recover nominal damages . . . ."). Accordingly, the Court finds that, drawing all inferences in his favor, Mr. Williams breached ¶ 5.1 with regard to Mr. Lawver, with the amount of damages best decided by a jury at trial.

Accordingly, Plaintiff's motion for summary judgment on its breach of contract for employee non-solicitation against Defendant Williams is **GRANTED** with his actions towards Mr. Lawver. Plaintiff's remaining claims for breach of contract on employee non-solicitation contain genuine issues of

---

[8] Defendants did not dispute the admissibility of this evidence. See Dkt. No. [140-1] at 59–60.

material fact to be decided by a jury and its motion—as well as Defendants'
motion on those claims—are **DENIED**.

### ii.   Customer Solicitation (¶ 5.3)

Next, Plaintiff argues that Defendants Green and Williams breached the
customer non-solicitation provisions in their employment agreements through
both direct and indirect solicitation. Plaintiff argues that Defendant Williams
directly solicited Plaintiff's customers using a template solicitation that he sent
from his Meridian email address to five of Plaintiff's current customers and one
of Plaintiff's prospective customers.[9] Dkt. No. [117-2] at 9. Plaintiff states that one
recipient of that template solicitation message, Northside Hospital, was confused
by the message and called Defendant Green to ask whether Defendant Williams
still worked for Plaintiff and whether Meridian was a distinct entity from

---

[9] The email sent from Ryan Williams to Northside Hospital read, in part, as
follows:

> I am reaching out to introduce my new company: Meridian Inventory
> Services. I have assembled a team of experts with Clinical, Inventory
> collection, Analysis and Optimize expertise. Our Team has decades of
> experience working exclusively in the hospital pharmacy setting, and have
> conducted inventory or analyzed data for tens of thousands of inventories
> across the United States. No other inventory service provider has the
> experience, knowledge or expertise like MIS. Inventory Expertise includes
> Data Collection, Analysis and Optimization**.** What we do: 1. Meridian
> Inventory Services (MIS) specializes in pharmacy inventory services, and
> works exclusively within the pharmacy setting . . . ."

Dkt. No. [119-3] at 14–15 (emphasis omitted). In another template email to at
least four pharmacies, Defendant Williams introduced Meridian and also closed
by stating that the customer "would greatly benefit from [Meridian's] services."
Dkt. No. [119-3] at 25, 27, 43, 47–48.

Plaintiff. Id. at 10 n.7. In addition to those template emails, Plaintiff argues that Defendant Williams directly solicited other university health systems to promote Meridian via other email messages. Id. at 10.

Separately, Plaintiff argues that the Individual Defendants indirectly solicited Plaintiff's customers in two ways: (1) Defendant Williams shared information about services he would offer via Meridian with Plaintiff's customers that reached out to him concerning Plaintiff's services, and (2) Defendants Green and Williams used a third-party, Dennis Bacon, to indirectly solicit customers. Dkt. No. [117-2] at 11. Plaintiff claims that Mr. Bacon referred four customers to Meridian that are now serviced by Meridian. Id. at 12. Defendant Williams sent an email to another customer that said "I will be leaving [Plaintiff] soon and do not think it would be prudent to offer pricing on their behalf. Chris Green, Asst DOO [sic], will provide pricing on their behalf. I can however, offer pricing for my company, as well as include some service capabilities." Dkt. No. [119-3] at 32. Later on in that email chain, Defendant Williams emailed Defendant Green concerning that same client and said, "Did you ever hear back from this one looking for a proposal (from CI)?" Id. at 28. In another message, Defendant Williams told a customer about his departure from Plaintiff and said, "once I set sail I can't guarantee how things will go at [Plaintiff] as I have 4 KEY people going with me. . . ." Id. at 37.

Defendants argue that they passively accepted the business of Plaintiff's former customers in a way that is protected by Georgia law. Regarding Plaintiff's

claim of Defendant Williams's direct solicitation via email, Defendants argue that those emails did not constitute solicitation. Dkt. No. [140] at 8. Additionally, Defendants argue that the customers Plaintiff alleges were solicited were either no longer Plaintiff's customers, were not actually Meridian's customers, or had independently approached Meridian looking to switch service providers. Dkt. No. [127-2] at 32. Further, Plaintiff argues that it only contacted Plaintiff's customers about inventory "optimization" services, which it claims Plaintiff did not offer. Dkt. No. [127-2] at 32–33.

Under Georgia law, "solicitation" has been broadly construed to comport with dictionary definitions of the term. Akron Pest Control, 455 S.E.2d at 602. Those definitions used by Georgia courts include "to endeavor to obtain by asking or pleading," "[t]o appeal for something," and, generally, that "[t]he term implied personal petition and importunity addressed to a particular individual to do some particular thing." Id. at 602–03. Under the framework, for an employee to breach such a provision "would require some affirmative action on his part that could be considered solicitation in the broadest possible sense." Id. (citing Marcoin, Inc v. Waldron, 259 S.E.2d 433 (Ga. Ct. App. 1979). By contrast, "[m]erely *accepting* business that [the employee] was forbidden otherwise to seek out for a period of time does not in any sense constitute a solicitation of that business." Id. (italics in original). This requirement that the employee must commit an "affirmative act" to violate the provision is essential to the enforceability of customer non-

solicitation covenants. <u>Fine v. Commc'n Trends, Inc.</u>, 699 S.E.2d 298, 306–07 (Ga. Ct. App. 2010).

The Court finds that, as a matter of law, Defendant Williams breached the customer non-solicitation provision by contacting Plaintiff's customers and advertising Meridian's services in email correspondence that amounted to direct solicitation. Defendant Williams's emails include direct messages to several of Plaintiff's clients, not just introducing Meridian as a new business venture but offering inventory services and stating that the clients would "benefit greatly from [Meridian's] services." Dkt. No. [119-3] at 25, 27, 43, 47–48. Follow-ups to these emails include offers to craft proposals and speak further about services that can be offered. <u>Id.</u> at 19, 29, 31, 33, 39. As just one example of Defendant Williams reaching out directly to solicit one of Plaintiff's customers, Defendant Williams emailed Yale-New Haven Health System ("YNHH"), mentioning that their current inventory service agreement would expire in a few months and "requesting that YNHH consider my service for future inventory engagements." Dkt. Nos. [119-4] at 6; [125] at 198. Defendant Williams added, "Given our history and that I know YNHH's inventories very intimately I am certain that we can provide a superior service to that of YNHH's current provider." Dkt. Nos. [119-4] at 6.

The Court also rejects Defendants' argument that these emails only advertised optimization services, which Defendants claim Plaintiff did not offer. First, the subject-line of many of these emails was "Pharmacy Inventory" and at

least one email exchanged discussed the Cooper Green Mercy Health inventory—
which was an actual inventory rather than merely an inventory optimization
service—as an example of the work Meridian was doing. Dkt. No. [119-3] at 39.
The template email message sent by Defendant Williams touted Meridian as
having "a team of experts with Clinical, Inventory Collection, Analysis and
Optimization expertise" that had "conducted inventory or analyzed data for tens
of thousands of inventories" and comparing it to other "inventory service
provider[s]." Id. at 54. Defendant Williams's solicitations plainly offered
generalized inventory services in addition to just optimization services. For
example, the email to YNHH referred to Meridian as a "pharmacy inventory
service company" and offered its services "for future inventory engagements." Id.
at 6.

Defendant Williams's emails also refute the notion that, rather than solicit
business, Defendants passively accepted Plaintiff's former customers' business.
Instead, the emails show that Defendant Williams took affirmative acts to
introduce his new, competing company and requested to do business for those
customers.

Because the Court finds that Defendant Williams's actions amounted to
direct solicitation, it need not reach the issue of indirect solicitation to hold that
Defendant Williams breached ¶ 5.3. Drawing all inferences in Defendant
Williams's favor, the Court finds that Plaintiff has established that Defendant
Williams breached the customer non-solicitation provisions in ¶ 5.3. Plaintiff's

motion for summary judgment on this point as to Defendant Williams is **GRANTED**.

However, Plaintiff's evidence does not conclusively show that Defendant Green engaged in customer solicitation—directly or indirectly. All of the customer solicitation emails discussed above were sent by Defendant Williams alone. Defendant Williams also was the one to email with Mr. Bacon about moving customers from Plaintiff to Meridian—Defendant Green was not even copied on those messages. Dkt. No. [125-1] at 83. The only action attributed to Defendant Green in the context of customer solicitation is his role in communicating with Northside Hospital, who reached out to Defendant Green after receiving Defendant Williams's email about Meridian services. While Defendant Green testified that he was unaware of Defendant Williams's emails to Plaintiff's customers, Plaintiff argues that Defendant Green knew about the emails and communicated with Northside Hospital regarding them. Plaintiff has not shown that Defendant Green violated this provision as a matter of law but has produced enough evidence regarding Defendant Green and his role in Meridian to survive Defendants' motion for summary judgment on this point.

For those reasons, Plaintiff's motion for summary judgment is **DENIED** as to whether Defendant Green breached ¶ 5.3 of his employment agreement. Defendants' motion for summary judgment on this point is also **DENIED** for both Defendants Green and Williams.

### 3. Confidential Information

The final provisions at issue are ¶¶ 4.1 and 4.2, which deal with Plaintiff's proprietary and confidential information.[10] Those provisions state as follows:

[¶ 4.1]

The Employee acknowledges that in the course of the Employee's employment under this Agreement, the Employee will be making use of the Company's proprietary and confidential information of a special and unique nature and value, including such matters as, but not limited to, the Company's business operations, internal structure and financial affairs; the Company's systems and procedures; the Company's confidential reports and lists of former, present, and prospective customers, vendors, suppliers and employees; the Company's marketing and business strategy; the pricing structure of the Company's publications and other products; information relating to the Company's proposed publications and other products; the Company's contracts and agreements with authors, editors, societies and other persons and entities with whom the Company has contractual relations; and other proprietary and confidential information, all of which is and shall be deemed to be proprietary and confidential information (the "Proprietary and Confidential Information"). The Employee agrees that while employed by the Company and upon and after the cessation of the Employee's employment with the Company for any reason whatsoever, the Employee shall not, for any reason or purpose whatsoever, directly or indirectly, divulge or disclose to any person or entity any of the Proprietary and Confidential Information or any other information or knowledge respecting the business or affairs of the Company or any of the Company's officers, directors, employees, stockholders or customers learned or conceived by the Employee while in the employ of the Company, but shall hold all of the same confidential and inviolate.

[¶ 4.2]

All financial books, records, instruments and documents; customer lists; data; reports; programs; software; hardware; tapes; CDs; DVDs;

---

[10] Plaintiff suggests that the term "proprietary and confidential information" encompasses more than just its "trade secrets." Dkt. No. [137] at 18.  The Court addresses the trade secret claims under the GTSA and DTSA directly below.

flash cards; rolodexes; contact lists; any and all other instruments, records and documents recorded or stored on any medium whatsoever relating or pertaining, directly or indirectly, to authors, editors, societies and other persons and entities with whom the Company has contractual relations, the Services rendered by the Employee and the Company's business and affairs (collectively, the "Records") shall at all times be and remain the property of the Company. Upon the cessation of the Employee's employment with the Company for any reason whatsoever, the Employee shall return to the Company all Records (whether furnished by the Company or prepared by the Employee), and the Employee shall neither make nor retain any copies of any of such Records after such cessation.

Dkt. Nos. [1-1] at 3–4; [1-2] at 3–4. Defendants have not challenged the enforceability of these provisions. Accordingly, the Court considers breach.

Plaintiff argues that ¶¶ 4.1 and 4.2 prohibit Defendants Green and Williams from taking, using, and failing to return Plaintiff's confidential information. Dkt. No. [117-2] at 14. Plaintiff argues that the Individual Defendants breached these provisions in two ways. First, Plaintiff argues that both Individual Defendants copied Plaintiff's files onto USB drives for an improper purpose and did not return those files or the USB drives themselves. Second, Plaintiff argues that Defendant Williams shared Plaintiff's confidential information including its billing practices with one of Plaintiff's Competitors, a company called WIS, while he worked as a consultant for WIS.

### a. USB Drive File Copying and Retention

Plaintiff claims that both Individual Defendants misappropriated Plaintiff's files containing confidential information by copying documents onto USB drives. Plaintiff alleges that Defendant Green downloaded the file directories for around

100 of Plaintiff's customers on to a USB drive on April 28, 2020 and never returned the files or the USB device. In support of this allegation, Plaintiff provides testimony of two individuals: a computer forensic analyst, Greg Freemyer, and Plaintiff's President and Chief Operating Officer, Shannon McArthur. Dkt. Nos. [117-12, 117-13]. Mr. Freemyer conducted a forensic image and analysis of Defendants Green and Williams's computers to review deleted files and USB activity, which Plaintiff argues shows a breach of his confidentiality obligations under his employment agreement. Dkt. Nos. [117-13] at 3–5; [117-2] at 15.[11] Mr. Freemyer identified that files were transferred to a USB drive with a particular serial number, while Mr. McArthur testified that that particular USB drive was never returned to Plaintiff or located on its premises. Dkt. No. [117-12] ¶ 12. Mr. McArthur also testified that the nature of the Individual Defendants'

---

[11] Defendants argue that the Court should exclude the following statement from Mr. Freemyer: "Based on my experience as a forensic computer expert, I believe that it is reasonable to conclude that Chris Green and Ryan Williams copied a significant amount of Capital's files onto different USB storage devices, which remain in their sole possession." Dkt. No. [140] at 12 (quoting Dkt. No. [117-13] ¶ 16 (Freemyer declaration)). Defendants briefly argue that Mr. Freemyer failed to compare the Individual Defendants' USB use over time or in relation to Plaintiff's other employees, which they argue makes his statement unreliable and not based on scientific knowledge. Id. at 11–12. Mr. Freemyer's declaration detailed his thirty-five years of information technology experience, experience working in computer forensics, and the tools he used to conduct the forensic image and analysis of the computers (X-Ways Forensics, Internet Evidence Finder, and USB Detective). Dkt. No. [117-13] ¶¶2–6. Mr. Freemyer's declaration provides a sufficient explanation of his process and rationale at this stage, particularly given that Defendants have not challenged his qualifications, experience, or methodology.

downloads was inconsistent with their job duties, even considering Covid-19 teleworking policies. Id. ¶ 11.

Mr. Freemyer's forensic review also suggested that Defendant Williams copied a number of Plaintiff's files with titles related to physical inventories, inventory optimization, as well as "specific customer files including contact information, cost data and pricing information" onto USB devices between September 2018 and May 2020. Dkt. No. [22-1] at 4. Like with Defendant Green, Mr. McArthur testified that this behavior was inconsistent with his job duties. Dkt. No. [117-12] ¶ 11. Mr. McArthur also testified that Plaintiff is not in possession of any USB devices returned by Mr. Williams. Id. ¶ 12.

Broadly, Defendants challenge the sufficiency of Plaintiff's evidence to show that they retained, used, or disclosed Plaintiff's confidential information. They argue that the forensic report prepared by Mr. Freemyer can only show their access to Plaintiff's information while they were employed, but not that they used it in any inappropriate manner or retained it after they stopped working for Plaintiff. Defendants argue that any files they copied to USB drives were used solely in the course of their employment with Plaintiff to facilitate their offsite work and follow Plaintiff's procedures for backing-up work files. Dkt. No. [127-2] at 23–24. They argue that Mr. Freemyer's report shows that they were copying Plaintiff's documents onto USB devices before Meridian was ever formed, suggesting that their use of USB files was not for Meridian's benefit. Id. at 23. Defendants also argue that Mr. Freemyer's report does not show any illegal or

improper access to Plaintiff's files, which they allege is consistent with their use of Plaintiff's files for work-related purposes.[12] Id. at 24.

The Court finds that Plaintiff's evidence on this point, including Mr. Freemyer's report, does not establish that Defendants Green and Williams breached ¶¶ 4.1 and 4.2 as a matter of law. While Mr. Freemyer's declaration said that he did not see a work-related purpose for copying information in this manner and Mr. McArthur stated that their job duties did not require it, that does not go far enough as to show that Defendants Green and/or Williams improperly retained or used the information. Both Defendants Green and Williams testified that whatever USB drives they had from Plaintiff were returned. Dkt. Nos. [123] at 93; [141] at 35. Defendant Green also testified that using USB drives was part of Plaintiff's practice in conducting inventories, backing-up data, and moving things around the office. Dkt. No. [123] at 87–88, 89. Defendant Green testified further that, as part of his duties with Plaintiff, there were "a lot" of times that he needed to copy or download hundreds of files at once, including with information from multiple customers' accounts. Id. at 89, 92. Plaintiff's evidence cannot show with certainty what happened to the files once they were downloaded, including

---

[12] Separately, Defendants argue that the files identified in Mr. Freemyer's report were not proprietary, confidential, or trade secret information. The Court disagrees—Mr. Freemyer's declaration lists the kinds and titles of files copied onto the USB drives, which includes customer information including contacts, cost data, and pricing information which would reasonably be considered part of Plaintiff's "Proprietary and Confidential Information" under ¶ 4.1.

whether they were retained or misused, and Defendants have testified to a legitimate use for copying and downloading the files.

### b. Defendant Williams's Emails

Second, as to Defendant Williams, Plaintiff argues that after he stopped working for Plaintiff he began consulting for Plaintiff's competitor, WIS, and shared information about Plaintiff's billing practices and rates to help WIS replace Plaintiff as the exclusive inventory provider for one of Plaintiff's customers. Dkt. No. [117-2].

Plaintiff refers to a June 29, 2020 email between Defendant Williams and a WIS employee who asked direct billing practice questions which Defendant Williams responded to with the requested information. Dkt. No. [119-4] at 27. This email exchanged concerned one client, Inmar, that had previously terminated its contract with Plaintiff and was negotiating its "scope of work" to hire WIS as its inventory services vendor. Dkt. No. [125] at 223. Defendant Williams answered a series of specific questions about how rates were charged "historically"—including suggested discounts and exceptions—based on Defendant Williams's "experience here." Dkt. No. [119-4] at 19. Defendant Williams told WIS employees approximated dollar values for Plaintiff's portion of the selling rate and compared it to other, more competitive figures. Id. at 17. Defendant Williams added, "Not knowing what your end goal is or what your target margin is, I know where you need to be and what the ratio should be if you truly want this contract." Id.

39

At his deposition, Defendant Williams testified that he was aware of Inmar's expectations as a result of working for Plaintiff. Dkt. No. [125] at 220. Defendant Williams testified that WIS "didn't know the . . . hospital pharmacy world" and wasn't familiar with that form of billing or the fee schedules used, so he explained it to them. Id. at 225–26. Defendant Williams elaborated that the WIS employee "indicated to [Defendant Williams] that they didn't want to undercharge, but then they didn't want to overcharge. So he asked [Defendant Williams] some specific questions and [Defendant Williams] clarified for him because they were not familiar with how to bill for this type of service." Id. at 227. This testimony directly contradicts Defendants' argument that all the information Defendant Williams gave WIS was information that WIS already had. Instead, both Defendant Williams's testimony and the questions posed by WIS in its emails that Defendant Williams answered show that the information he provided was not otherwise available to WIS.

Defendant Williams argues that WIS and Inmar had a pre-existing relationship and that he did not begin consulting with WIS until he stopped working for Plaintiff. Defendant Williams also argued that WIS is not Plaintiff's competitor because it provides hospital pharmacy services exclusively for Inmar. But ¶ 4.1 prevents employees from divulging or disclosing Plaintiff's proprietary information to anyone—whether they are a competitor or not. Additionally, ¶ 4.1 prevents the employee from sharing Plaintiff's information even after they are no longer employed by Plaintiff. Dkt. No. [1-2] ¶ 4.1.

Accordingly, Plaintiff's motion for summary judgment for breach of the confidential information provisions is **GRANTED** with respect to Defendant Williams and the WIS disclosure. Plaintiff's motion for summary judgment is **DENIED** as to Defendant Green and the other issues with Defendant Williams. Defendants' motion for summary judgment on this issue is **DENIED**.

### ii.   Breach of Fiduciary Duty

Plaintiff's next claim is against Defendants Green and Williams for breach of fiduciary duty. Defendants argue that Plaintiff's breach of fiduciary duty claim is preempted by the Georgia Trade Secrets Act and that the GTSA provides the exclusive remedy for torts based on the misappropriation of trade secrets. Dkt. No. [140] at 14. The relevant portion of the GTSA states: "Except as provided . . . this article shall supersede conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret." O.C.G.A. § 10-1-767(a). "For the GTSA to maintain its exclusiveness, a plaintiff cannot be allowed to plead a lesser and alternate theory of restitution simply because the information does not qualify as a trade secret under the act." Robbins v. Supermarket Equip. Sales, LLC, 722 S.E.2d 55, 57 (Ga. 2012); see also Diamond Power Int'l v. Davidson, 540 F. Supp.2d 1322, 1345 (N.D. Ga. 2007) ("[I]t would make little sense to go through the rigamarole of proving information was truly a trade secret if a plaintiff could alternatively plead claims with less burdensome requirements of proof."). But the statute goes on to save from preemption "[o]ther civil remedies that are not based upon misappropriation of a trade

secret." O.C.G.A. § 10-1-767(b). Accordingly, the key question is whether Plaintiff's state tort claims for breach of fiduciary duty is based on the same conduct Plaintiff alleges in support of its misappropriation of trade secrets claim.

Plaintiff argues that its breach of fiduciary duty claim is based on Defendants Green and Williams's competition with Plaintiff through Meridian while employed and its solicitation of Plaintiff's customers and employees. Dkt. No. [147] at 10. Plaintiff argues that an employee breaches a fiduciary duty by directly competing with his or her employer, by soliciting the employer's employees to leave the company, and by soliciting customers away from their employer while still being employed. Dkt. No. [117-2] at 20 (citing <u>Pinnacle Agric. Distrib. v. Mayo Fertilizer, Inc.</u>, 1:17-cv-29 (LJA), 2017 U.S. Dist. LEXIS 30978, at *10–11 (M.D. Ga. Mar. 6, 2017)).

The Court agrees with Plaintiff that it has alleged conduct that would constitute a breach of fiduciary duty that is not predicated upon the misappropriation of trade secrets and therefore not preempted by the GTSA. As Plaintiff argued, "acts in direct competition with the employer's business," including solicitation of customers, constitute a breach of fiduciary duty. <u>Hanson Staple Co., Inc. v. Eckelberry</u>, 677 S.E.2d 321, 323 (Ga. Ct. App. 2009); see also <u>Pro. Energy Mgmt. v. Necaise</u>, 684 S.E.2d 374, 378 (Ga Ct. App. 2009) ("As an employee of [Plaintiff,] [each Defendant] had a duty not to solicit its clients or directly compete with it during his employment."). Accordingly, because Plaintiff has alleged conduct other than the misappropriation of proprietary information

to support its claim for breach of fiduciary duty, this claim is not preempted by the GTSA. <u>Mauser U.S. v. Wilburn</u>, 1:19-cv-02361-AT, 2019 WL 8376209, at *4–5 (N.D. Ga. Nov. 22, 2019).

The next question the Court must resolve is whether Defendants Green and Williams owed a fiduciary duty to Plaintiff. The Individual Defendants argue that they did not owe a fiduciary duty because they could not bind Plaintiff without approval from Plaintiff's other employees. Dkt. No. [140] at 14. Specifically, Defendants argue that Mr. McArthur had the "final say" in authorizing client contracts, invoicing rates, and fee structures. <u>Id.</u> When asked whether the Individual Defendants had "any authority to set customer pricing without your authorization," Mr. McArthur testified that they "would suggest something to me, but they always came to me for the final quote." Dkt. No. [121] at 15. Mr. McArthur went on to testify that "they were able to make decisions, but they would come to me for final decisions on certain things and, yes, pricing was one of them." <u>Id.</u> at 17. Finally, when asked about customer contracts, Mr. McArthur answered affirmatively that he "had the final say," approved the "majority" of invoicing rates, and that he made "[t]he final decision, but [Green and Williams] had a part of it." Dkt. No. [121] at 25–26.

On the other hand, Plaintiff argues that Defendants Williams had the authority to manage employees, assign inventory teams, schedule inventories, promote employees, communicate directly with customers on Plaintiff's behalf, serve as a liaison to customers, and travel to conduct inventories. Dkt. No. [117-2]

43

at 18. Plaintiff's corporate representative, Mr. McArthur, testified that Defendant Green had essentially the same responsibilities, but with fewer responsibilities in the area of sales. Dkt. No. [121] at 15. Additionally, both Defendant Green and Williams answered affirmatively when asked whether their position reflected the "trust and confidence that [Plaintiff] had in [their] abilities." Dkt. Nos. [123] at 25–26; [125] at 27.

Plaintiff's cited testimony does not conclusively establish that Defendants Green and Williams bound Plaintiff or otherwise had a fiduciary duty to Plaintiff while acting as its Director of Operations and Assistant Director of Operations, respectively. Dkt. No. [123] at 19–20. Defendants' evidence also does not conclusively establish that there was no such duty. While Plaintiff has listed a litany of the Individual Defendants' responsibilities, Plaintiff has not shown how any of Defendant Green or Williams's actions had the effect of binding Plaintiff. Mr. McArthur testified that he had broad supervisory authority over the Individual Defendants and that they needed approval before authorizing contracts or prices—in other words, before Plaintiff was bound. But a reasonable jury could find that Defendants did owe a fiduciary duty because of their respective responsibilities. Given the lack of conclusive evidence, this issue is best left for a jury to decide. See Gresham & Assocs. Inc. v. Strianese, 595 S.E.2d 82, 84 (Ga. Ct. App. 2004) (finding genuine factual issue as to whether vice president who was in charge of a department and with customers owed a fiduciary duty); Hilb, Regal & Hamilton Co. of Atlanta, Inc. v. Holley, 644 S.E.2d 862, 867 (Ga.

Ct. App. 2007) (finding a genuine issue of material fact as to whether a vice president was an agent owing a fiduciary duty to his employer).

Because Defendants have argued that they should be granted summary judgment because there was no breach of any fiduciary duty, the Court considers their arguments on breach. Defendants argue that they did not breach any fiduciary duty owed as a matter of law because they only made *plans* to compete while employed. Merely making plans to compete while employed does not constitute the breach of any fiduciary duty. Nilan's Alley, Inc. v. Ginsburg, 430 S.E.2d 368, 369 (Ga. Ct. App. 1993); E.D. Lacey Mills v. Keith, 359 S.E.2d 148 (Ga. Ct. App. 1987). "Even though he can make plans to compete, however, an employee is not entitled to solicit customers for a rival business before the end of his employment nor can he properly do other similar acts in direct competition with the employer's business." Hanson Staple Co., Inc., 677 S.E.2d at 323 (alteration adopted) (quotation marks omitted). As previously discussed, Plaintiff has conclusively demonstrated that Defendant Williams actually solicited Plaintiff's customers and that there is a genuine issue of fact as to whether Green solicited customers while employed as well. Because of that conduct alone, Defendants cannot show that they did not breach any fiduciary duties owed as a matter of law.

Accordingly, both Plaintiff's and Defendants' motions for summary judgment on the breach of fiduciary duty claim are **DENIED.**

### iii. Tortious Interference

Both Plaintiff and Defendants' have moved for summary judgment on Plaintiff's claims for tortious interference with business relationships and employees. The Court begins by addressing the issue of preemption before discussing the substance of the tortious interference claim.

### 1. Preemption

Like Plaintiff's breach of fiduciary duty claim, Defendants argue that Plaintiff's tortious interference claim is preempted by the GTSA. Dkt. No. [127-2] at 35–36. As discussed above, to survive preemption, Plaintiff must demonstrate that its tortious interference claim is based on the same factual allegations that Plaintiff has used to allege a violation of the GTSA.[13] See O.C.G.A. § 10-1-767(a); Penalty Kick Mgmt. Ltd. v. Coca Cola Co., 318 F.3d 1284 (11th Cir. 2003). Defendants argue that Plaintiff cannot do so because they argue that the only "improper or wrongful conduct" that Plaintiff has alleged to satisfy the first element of tortious interference is the misappropriation of confidential information. Dkt. No. [140] at 16. Plaintiff argues that Defendants' conduct unrelated to confidential information—namely, the solicitation of Plaintiff's

---

[13] Because the critical question is whether the same factual basis is used to support the two claims, the issue of whether the information at issue is ultimately found to be a trade secret under the GTSA is not determinative of the preemption question. Mauser U.S. v. Wilburn, 1:19-cv-02361-AT, 2019 U.S. Dist. Lexis 238068, at *7–8 (N.D. Ga. Nov. 22, 2019).

employees and customers—can constitute tortious interference and are independent from its allegations under the GTSA. Dkt. No. [147] at 19–21.[14]

The Court agrees with Plaintiff that its tortious interference claim is not preempted by the GTSA. While misappropriation of confidential information is one type of wrongful or improper conduct that could make up a tortious interference claim, Plaintiff has pled, provided evidence, and raised arguments that Defendants maliciously interfered with its customer and employee relationships through conduct independent of their use of confidential information. See Dkt. No. [1] ¶¶ 100–12. See Prof'l Energy Mgmt., 684 S.E.2d at 378.

### 2. Elements

Plaintiff alleges that Defendants committed tortious interference with business relationships and tortious interference with employment relationships. The following four elements govern these claims:

> Tortious interference claims, whether asserting interference with contractual relations, business relations, or potential business relations, share certain common essential elements: (1) improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and with malice with the intent to injure; (3) the defendant induced a breach of contractual obligations or caused a party or third parties to discontinue or fail to enter into an anticipated business relationship with the plaintiff; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff.

---

[14] To the extent Plaintiff does argue that Defendants' use of confidential information, like using Plaintiff's price information to offer discounts to its customers for switching to Meridian, the Court disregards that evidence. Dkt. No. [147] at 12.

Fortson v. Brown, 302 Ga. App. 89, 92, 690 S.E.2d 239, 241 (Ga. Ct. App. 2010). The Supreme Court of Georgia has held that, "[p]arties to a contract have a property right therein with which a third party cannot interfere without legal justification or privilege, and a party injured by another's wrongful interference may seek compensation in tort" under O.C.G.A. § 51-12-30. Atlanta Market Center Mgmt. Co. v. McLane, 503 S.E.2d 278, 282 (Ga. 1998).[15]

To establish its claim, Plaintiff "must adduce evidence of improper action or wrongful conduct, which our courts have defined as constituting conduct wrongful in itself; thus, improper conduct means wrongful action that generally involves predatory tactics such as physical violence, fraud or misrepresentation, defamation, use of confidential information, abusive civil suits, and unwarranted criminal prosecutions." Fortson, 690 S.E.2d at 241; see also Stefano Arts v. Sui,

---

[15] Defendants make a one-line argument in their reply to their motion for summary judgment that Defendants Green and Williams were not strangers to the business relationships at issue. Dkt. No. [150] at 14. Georgia courts refer to this requirement as the "stranger doctrine," and it provides that "'only a stranger to . . . the business relationship giving rise to and underpinning the contract may be liable for tortious interference . . . .'" Mabra v. SF, Inc., 728 S.E.2d 737, 740 (Ga. Ct. App. 2012) (quoting Perry Golf Course Dev., LLC v. Hous. Auth., 670 S.E.2d 171 (Ga. Ct. App. 2008)). Defendants did not make an argument under the stranger doctrine in either their motion for summary judgment or their response to Plaintiff's motion for summary judgment. See Dkt. Nos. [127-2, 140]. Accordingly, the Court declines to consider this argument to the extent the argument was not developed and Plaintiff was not afforded an opportunity to respond. The Court also notes that Plaintiff has sufficiently argued in its motion for summary judgment that Defendants Green and Williams were strangers because they were acting to further Defendant Meridian's interests and against Plaintiff's interests by pursuing Plaintiff's customers and employees and competitors are strangers. Dkt. No. [117-2] at 24.

690 S.E.2d 197, 202 (Ga. Ct. App. 2010); Kirkland v. Tamplin, 645 S.E.2d 653,

656 (Ga. Ct. App. 2007) (cert. denied. Sept. 10, 2007) Pharmerica Long-Term

Care, Inc. v. Krystopowicz, No. 2012 WL 12950329 *3 (N.D. Ga. Aug. 29, 2012).

That means Plaintiff "must show more than that the defendant simply persuaded

a person to break a contract." Kirkland v. Tamplin, 285 Ga. App. at 244; see also

Stefano Arts, 690 S.E.2d at 202; Coloplast Corp. v. American Breast Care, L.P.,

209 F. App'x 945, 946 (11th Cir. 2006).

Plaintiff argues that the Individual Defendants acted improperly, without

privilege, and on Defendant Meridian's behalf when they solicited Plaintiff's

customers and employees. Dkt. No. [117-2] at 24–25. Defendants argue that the

conduct alleged by Plaintiffs does not rise to the level necessary to be considered

"improper conduct." Dkt. No. [127-2] at 37 (quoting Fortson, 690 S.E.2d at 241).

Defendant also argues that its actions soliciting customers and employees were

legal as competition in the free marketplace. Id. at 38. Plaintiff argues that

Defendants made misrepresentations, defamatory statements, and mis-used its

confidential information against Plaintiff. Dkt. No. [147] at 13.[16] Plaintiff

specifically states that its employee, Mr. Johnson, told Defendant Williams about

an idea to change the inventory process, and that Defendant Williams falsely told

Mr. Johnson that Plaintiff was not interested in that idea so that Defendant

---

[16] Plaintiff argues that Defendants used its confidential rate information and
wholesaler cost information. Dkt. No. [137] at 24. As discussed above, for
Plaintiff's tortious interference claim to not be preempted, it must be based on
facts and allegations unrelated to Defendants' use of confidential information.

Meridian could pursue it. Plaintiff has come forward with testimony to substantiate its allegations, and Defendants have come forward with testimony disputing those facts. See Dkt. Nos. [137-2] ¶¶ 4, 5 (Johnson declaration); [137-1] ¶ 11 (McArthur declaration); [150-3] ¶¶ 3–5 (Williams declaration). The parties do not specifically argue whether this fact demonstrates interference with business relationships or employment relationships, but Plaintiff argues generally that this implicates both claims.

The conflicting testimony on this issue—specifically, whether Defendant Williams told Mr. Johnson that Plaintiff was not interested in his ideas, whether Defendant Williams shared the idea with Plaintiff's executives, and whether Defendant Meridian used the idea—create a genuine issue of material fact as to whether Defendants engaged in misrepresentations or other improper conduct. Id.

The Court rejects Defendants' remaining arguments that they are entitled to summary judgment on this claim. Defendants argue that Plaintiff cannot show that it would have had ongoing contractual relationships with its employees or customers. Plaintiff argues that several of its former customers and employees are now Defendants' customers and that it has incurred financial injury from those losses. Dkt. Nos. [137] at 25; [145] at 13. The Court agrees with Plaintiff that it has shown enough proof of previously ongoing relationships and financial injury from the loss of those relationships to make it to trial on that issue.

The Court finds that a reasonable jury could conclude that Defendants tortiously interfered with Plaintiff's employee relationships and business relationships. But genuine factual issues remain as to whether Defendants' conduct was improper and wrongful enough to find in Plaintiff's favor.

Accordingly, Plaintiff's and Defendants' motion for summary judgment on its tortious interference claims are **DENIED**.

### iv. Defend Trade Secrets Act and Georgia Trade Secrets Act

All parties move for summary judgment on Plaintiff's GTSA and DTSA claims. The first question the Court must resolve is whether Plaintiff had a trade secret that entitled it to the protections of the Defend Trade Secrets Act (DTSA) or its state law counterpart, the Georgia Trade Secrets Act (GTSA).

Plaintiff argues that its Scheduling Grid, Discount Sheets, historical inventory data, pricing data, historical customer data, and client database are all trade secrets used in interstate commerce. Dkt. No. [147] at 13. Plaintiff's customer data was accessible via a Microsoft web portal called CapWeb that also stored its inventory processes. Dkt. No. [138] at 57. Mr. McArthur testified that Plaintiff spent significant time and resources developing CapWeb and that it allows Plaintiff to compete with other inventory service providers. Dkt. No. [177-2] ¶ 4. He further testified that the information has economic value from not being generally known, not being readily ascertainable through proper means, and that others would derive economic gain from the use or disclosure of the

information. Id. Plaintiff argues that the Individual Defendants accessed, downloaded, and shared this information to bolster Meridian's business. Dkt. No. [117-2] at 29. Plaintiff includes examples of Defendant Green sending Plaintiff's customer inventory price file for one customer from his Capital email to his Meridian email, Dkt. No. [117-2] at 10, and Defendant Green emailing Ms. Bearsley a document titled "Meridian Cost File Requirements," which Plaintiff says was its file but with the name changed from Capital to Meridian, Dkt. No. [123-1] at 10, 14. In another email, Defendant Williams sent the price catalog for Yale New Haven Health System from his Capital email to Defendant Green's Meridian email, and included a message in the body of the email that said "For data mining.....[sic]". Dkt. No. [123-1] at 19. Plaintiffs' also point to the April 28, 2020 download of files to USB drives discussed above.

"A claim for misappropriation of trade secrets under the Georgia Trade Secrets Act requires a plaintiff to prove that (1) it had a trade secret and (2) the opposing party misappropriated the trade secret." Cap. Asset Rsch. Corp. v. Finnegan, 160 F.3d 683, 685 (11th Cir. 1998) (citation and quotation marks omitted). The same showings are required under the DTSA but with the additional requirement that the trade secret "is related to a product or service used in, or intended for use in, interstate or foreign commerce." Agilysys, Inc. v. Hall, 258 F. Supp. 3d 1331, 1348 (N.D. Ga. 2017) (quoting 18 U.S.C. § 1836(b)(1)).

## 1. Existence of a Trade Secret

The GTSA provides the following definition of a trade secret:

'Trade secret' means information, without regard to form, including but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, product plans, or a list of actual or potential customers or suppliers which is not commonly known by or available to the public and which information:

(A)   Derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other person who can obtain economic value from its disclosure or use; and

(B)   Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

O.C.G.A. § 10-1-761(4). Additionally, under both statutes, a plaintiff must take reasonable efforts under the circumstances to maintain the secrecy of its alleged trade secret. See 18 U.S.C. § 1839(3)(A) (defining as an element of a "trade secret" that "the owner thereof has taken reasonable measures to keep such information secret"); O.C.G.A. § 10-1-761 (defining as an element of a "trade secret" that it "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy"). "Whether information constitutes a 'trade secret' is a question of fact." Penalty Kick Mgmt. Ltd. v. Coca Cola Co., 318 F.3d 1284, 1291 (11th Cir. 2003).

Defendants challenge whether Plaintiff took reasonable steps to protect its information as trade secrets. Particularly, Defendants argue that the CapWeb portal in which Plaintiff stores its information, while being password-protected, is not secure because all of Plaintiff's employees have access to it and can use a link to bypass the requirement to enter credentials to use it. Additionally, Defendants argue that only nine of Plaintiff's seventy-three employees were

subject to non-disclosure policies and that Plaintiff did not monitor or track access to CapWeb. Defendants also argue that Plaintiff encouraged its employees to use USB flash drives and to save their work to USB devices, without regulating their circulation, use or return—which undermined other security measures in place. Finally, Defendants argue that Plaintiff shared its information with third parties by distributing its inventory data files and discount sheets to customers without expecting or requiring confidentiality.

Plaintiff attests that it took the following protective measures: password-protecting, limiting access to certain individuals on a need-to-know basis, limiting use to certain tasks, and requiring its employees to sign agreements containing non-disclosure provisions, such as ¶ 4.1 in the Individual Defendants' employment agreements described above. Dkt. Nos. [117-2] at 28–29; [147] at 14.

The Court finds there to be a genuine issue of material fact as to whether Plaintiff took reasonable measures under the circumstances to protect its information. "[O]nly in an extreme case can what is a 'reasonable' precaution be determined on a motion for summary judgment, because the answer depends on a balancing of costs and benefits that will vary from case to case . . . ." Rockwell Graphic Sys., Inc. v. DEV Indus., Inc., 925 F.2d 174, 179 (7th Cir. 1991). In some circumstances, information disclosed to customers may lose its protection under the GTSA. Diamond Power Int'l, Inc. v. Davidson, 540 F. Supp. 2d 1322 (N.D. Ga.) (citing Roboserve, Ltd. v. Tom's Foods, Inc., 940 F.2d 1441, 1454 (11th Cir.

1991)). Further, under the context of information being shared between employees within Plaintiff's organization:

> [T]rade secret protection is not destroyed by the "usual situation" in which secret information is shared with employees or other confidants who are legally obligated, by express or implicit agreement or by another duty imposed by law, to maintain its secrecy. Even in such a case, however, the plaintiff must demonstrate that it has taken reasonable efforts to maintain its secrecy by not widely distributing the information to its employees without proper controls.

Diamond Power Int'l, Inc., 540 F. Supp. 2d at 1334 (citation omitted) (citing Bacon v. Volvo Serv. Ctr., Inc., 597 S.E.2d 440, 443–44 (Ga. Ct. App. 2004). Georgia courts have found that employee-sharing of information can affect trade secret status if the employees are not all bound by confidentiality agreements, if confidentiality agreements are all that is done to maintain secrecy, of if the parties do not submit all of the employees' confidentiality agreements to the record—as is the case here. See Bacon, 597 S.E.2d at 443–44; Equifax Servs., Inc. v. Examination Mgmt. Svcs., Inc., 453 S.E.2d 488, 493 (Ga. Ct. App. 1994); Stargate Software Intern., Inc. v. Rumph, 482 S.E.2d 498, 502 (Ga. Ct. App. 1997). Defendant Williams and Green's testimony is sufficient to raise a factual question on this issue, which precludes a finding of summary judgment in Plaintiff's favor.

Defendants also argue that Plaintiff's information includes public information and information that it does not own. The Georgia Supreme Court has rejected the argument that information "cannot be a trade secret because it is composed primarily of matters within the public domain," noting that "[t]he fact

that some or all of the components of the trade secret are well-known does not preclude protection for a secret combination, compilation, or integration of the individual elements.'" Essex Grp., Inc. v. Southwire Co., 501 S.E.2d 501, 554 (Ga. 1998). Such information can be protected as a trade secret if "there has been accomplished an effective, successful and valuable integration of the public domain elements and the trade secret gave the trade secret owner a competitive advantage which is protected from misappropriation." Id. (quoting Rivendell Forest Prods. v. Georgia-Pacific Corp., 28 F.3d 1042, 1046 (10th Cir. 1994) (alterations adopted)). To go one step further, "even if all of the information is publicly available, a unique combination of that information, which adds value to that information, also may qualify as a trade secret." Penalty Kick Mgmt. Ltd., 318 F.3d at 1291. Plaintiff has sufficiently demonstrated the unique value of its customer inventory files, pricing info, and other information, including the CapWeb database.

## 2. Misappropriation

Next, Defendants argue that they are entitled to summary judgment because they did not retain, use, or disclose the information by returning all of Plaintiff's files. The Court has already made a preliminary decision as to the admissibility of Mr. Freemyer's declaration concerning Defendants Green and Williams's use of USB drives. The Court has also determined that there is a fact issue as to whether the copying and downloading of Plaintiff's files was done as part of the normal course of business or for the improper purpose of aiding

Meridian. Plaintiff has raised sufficient evidence, particularly the forwarding of customer data and price files from Defendants' Capital email addresses to their Meridian email addresses, for it to reach a jury on this claim. Plaintiff's examples of the emails sent from the Individual Defendants' Capital emails to their Meridian emails also refute Defendants' argument that they merely used information they had committed to memory.

Accordingly, both parties' motions for summary judgment on the GTSA and DTSA claims are **DENIED**.

### B. Defendants' Claims

Plaintiff moves for summary judgment on Defendants' counterclaims for defamation which includes separate counterclaims for libel and slander and tortious interference with business relationships. Defendant argues that there is a genuine dispute of material fact as to each. The Court addresses these claims in turn.

### i. Defamation

The parties agree that the following four elements apply to both libel per se and slander per se: (1) an unprivileged statement to a third party; (2) the statement was false, defamatory, and concerning Defendants; (3) Plaintiff was at least negligent in making the statement; and (4) Defendants suffered resulting

harm.[17] <u>Smith v. DiFrancesco</u>, 802 S.E.2d 69, 72 (Ga. Ct. App. 2017); <u>StopLoss Specialists, LLC v. VeriClaim, Inc.</u>, 340 F. Supp. 3d 1334, 1350 n.9 (N.D. Ga. 2018).

Defendants have argued that Plaintiff committed defamation per se by contacting Meridian's current and potential customers and telling them that Meridian was engaging in illegal activity and would soon be shut down. Dkt. No. [140] at 24. Defendants argue that these statements were false and damaging to its reputation, thus damaging their relationship with current and potential customers.

Defendants' evidence of Plaintiff's allegedly defamatory statements comes from Defendant Williams's testimony at his personal deposition and Defendant Meridian's 30(b)(6) deposition. Defendant Williams could not identify "specifically what has been said" by Plaintiff but said that he had "been contacted by a couple customers that were contacted by Capital or somebody at Capital indicating that there was a lawsuit . . . that they were going to take us to court, they were going to shut us down." Dkt. No. [117-5] at 55. Defendant Meridian also specifically named two of its customers' representatives—Ashley Powell from Ochsner Health and Dennis Bacon from Cardinal Health—who said they had been contacted by Plaintiff and that an email had been sent. <u>Id.</u> at 56. However,

---

[17] While Defendants' counterclaim pleaded both libel and slander as part of its defamation claim, the parties treat these two claims collectively as defamation and have not made any specific arguments under the elements of libel or slander.

Defendants have no evidence from those customers themselves because "nobody has been willing to go on the record to indicate what has or has not been said." Id. at 55. Defendant Williams also testified that one potential customer—Beth Israel Lahey Health—had asked for a contract but ultimately informed Meridian that it would not be moving forward with Meridian. Id. When asked whether other potential customers were lost, Williams could not recall any. Id. at 61. Williams testified that one potential customer, Beth Israel Lahey Health, "did not indicate specifically" that they decided not to work with Meridian further because of any disparaging statements from Plaintiff, but Defendant Williams said that he "had a conversation with somebody who then said, 'Hey, off the record, we're going to stay where we are because of the legal – the legal situation.'" Dkt. No. [117-5] at 60. Williams also testified that "a lot of these people, they want to be the customer, they don't want to be drug into the legal piece." Id. at 62.

Plaintiff makes three arguments against the defamation claims. First, Plaintiff argues that Defendants have no admissible evidence that it made any statements because Defendant Williams's testimony of what other parties told him is inadmissible hearsay under Federal Rule of Evidence 801(c). Second, Plaintiff argues that Defendants' testimony, even if admissible, is overly speculative and not specific enough to be considered defamatory. Third, Plaintiff argues that Defendants have not shown that they suffered any harm because of these statements. Dkt. No. [117-2] at 32–33.

First, on the hearsay question, Defendants argue that Defendant Williams's statement of what customers and potential customers told him that Plaintiff had said about Defendant Meridian's legal troubles was not hearsay because it was not being offered for the truth of the matter asserted. Instead, Defendants argue that the statements are being used for a non-hearsay purpose, to show that defamatory statements were made to third parties. Plaintiff offers no response to this non-hearsay purpose. Dkt. No. [147] at 15.

The Court agrees with Defendants. "'Because Plaintiff may introduce a defamatory statement to prove it was made, rather than to prove the truth of the matter asserted, the statement is not hearsay.'" Galbreath v. Hale Cnty., Ala. Comm'n, No. CV 15-308-CG-N, 2017 WL 663159, at *1 (S.D. Ala. Feb. 17, 2017) (quoting Bush v. Bank of Pinellas Cnty., 916 F. Supp. 1244, 1255 (M.D. Fla. 1996)). In response to this motion, Defendants can use testimony about what customers told Defendant Williams to show what statements were made to third parties, separate from showing whether the facts contained in those statements were actually true. Accordingly, at this stage, the Court will consider Defendant Williams's testimony in his personal deposition and Defendant Meridian's 30(b)(6) deposition regarding what Ashley Powell, Dennis Bacon, and the unnamed individual from Beth Israel Lahey told him that Plaintiff had communicated to them.

Having decided that those statements are admissible, the Court finds that Defendants have come forward with evidence that Plaintiff made false and

defamatory statements concerning Defendants. Defendant Williams's testimony is sufficient to create a factual issue as to whether these statements were made. While Defendants have not provided direct, quoted statements from Plaintiff, they have come forward with evidence that multiple customers had been told similar statements that Defendant Meridian would be shut down and otherwise pursued for illegal conduct. That is sufficient to be considered defamatory. Bellemead, LLC v. Stoker, 280 Ga. 635, 631 S.E.2d 693, 696 (Ga. 2006) (noting that to qualify as slander, a statement must "charge him with some defect of character or lack of knowledge, skill, or capacity as necessarily to affect his competency successfully to carry on his business, trade, or profession").

 Third, the Court also finds that there is a genuine factual issue as to whether Plaintiff's statements injured Defendants. Defendant Williams testified that the types of customers they work with are not interested in working with companies who they perceive as going through a legal battle. He also testified that an employee of one potential customer, Beth Israel Leahy Health, told him that the reason they decided not to go through with their Meridian contract was because of the legal situation surrounding Defendants.

Accordingly, Plaintiff has not shown that Defendants' defamation claims, including libel and slander, fail as a matter of law and its motion for summary judgment on this point is **DENIED**.

61

### ii. Tortious Interference with Business Relationships

Under Georgia law, tortious interference with business relationships "involves interference with prospective or inchoate property rights that the plaintiff has, or at least hopes to have, as a result of the operation of his business or pursuit of his occupation." Griffin v. Turner, 830 S.E.2d 239, 242–43 (Ga. Ct. App. 2019) (quoting Adams, Ga. Law of Torts § 33:3 (2018)). The parties agree that Defendants must show four elements to state a claim for tortious interference:

> (1) improper action or wrongful conduct by the defendant without privilege;
> (2) the defendant acted purposely and with malice with the intent to injure;
> (3) the defendant induced a breach of a contractual obligation or caused a party or third party to discontinue or fail to enter into an anticipated business relationship with the plaintiff; and
> (4) the defendant's tortious conduct proximately caused damage to the plaintiff.

Culpepper v. Thompson, 254 Ga. App. 569, 562 S.E.2d 837, 840 (2002).

Plaintiff argues that Defendants' tortious interference claim fails as a matter of law for two reasons. First, Plaintiff argues that Defendants cannot show that Plaintiff acted improperly, with malice, or intent to injure because Defendants have no admissible evidence of what Plaintiff said to Defendants' customers or whether those statements were defamatory. Second, Plaintiff argues that Defendants cannot show that they suffered any financial injury or that

Plaintiff induced any third party to terminate their business relationship with Defendants.

The Court has already decided the admissibility of the evidence and noted a genuine factual issue as to whether those statements constitute defamation. The Court finds that Defendants have produced enough evidence to survive summary judgment on the issue of Plaintiff's improper conduct and whether it acted with malice or intent to injure. Defendant Williams testified that he had been told by multiple current customers that they had heard from Plaintiff that Defendant Meridian was engaging in illegal activity and would be shut down. Defamatory statements are one form of improper conduct that can sustain a tortious interference claim. Fortson, 690 S.E.2d at 241.

As to whether Defendants can show any injury, Plaintiff's argument that Defendants did not lose any current customers as a result of the statement ignores their claim for damages from the loss of a potential customer—Beth Israel Leahy Health. In Meridian's 30(b)(6) deposition, Defendant Williams testified Meridian was close to entering a contract with Beth Israel Leahy Health but that they suddenly decided not to go through with the deal, and that he was later told "off the record" that it was because of the "legal situation." Dkt. No. [117-5] at 60. That creates a sufficient factual issue as to injury to reach a jury, given Georgia law's recognition of a party's right to not have future customer relationships injured. Griffin, 830 S.E.2d at 242–43.

For those reasons, Plaintiff's motion for summary judgment on Defendants' tortious interference counterclaim is **DENIED.**

## IV.   CONCLUSION

In accordance with the foregoing, the Plaintiff's Motion for Summary Judgment [117] is **GRANTED IN PART** and **DENIED IN PART**. Defendants' Motion for Summary Judgment [127] is **GRANTED IN PART** and **DENIED IN PART**. Plaintiff's claim under the Computer Fraud and Abuse Act (Count IV) is **DISMISSED WITHOUT PREJUDICE**.

The parties' Joint Pretrial Order is due 30 days from the date of this Order. If the parties request an extension of this deadline to attempt further attempts to settle the case, they are to contact the Court. At either parties' request, the Court can also refer this case to a Magistrate Judge for a mediation at no cost to either party.

**IT IS SO ORDERED** this 29th day of March, 2022.

**Leigh Martin May**
**United States District Judge**